RICHARD H. GREENER, ISB #1191
LaDAWN MARSTERS, ISB #5663
**COSHO, HUMPHREY, GREENER & WELSH, P.A.**
815 West Washington Street
Boise, ID 83702
Telephone: (208) 344-7811
Fax: (208) 338-3290



U.S. COURTS

03 JAN -2 PM 4:46

REC'D_____ FILED_____
CAMERON S. BURKE
CLERK      BOISE, IDAHO

FEE PAID

RCPT #13170

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT, DISTRICT OF IDAHO

| | |
|---|---|
| LINDA SMILEY and MARK SMILEY, Wife and Husband, <br><br> Plaintiffs, <br><br> v. <br><br> BAYER CORPORATION, a subsidiary of BAYER A.G.; and JOHN DOES 1 THROUGH 10, INCLUSIVE, <br><br> Defendants. | No. **CIV 03 - 0 0 0 5 - S - EJL** <br><br> **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO Fed. R. Civ. P. 38(b)** |

COME NOW, the Plaintiffs, Linda Smiley and Mark Smiley, wife and husband, by and through their undersigned counsel, and for causes of action against the Defendants, hereby allege as follows:

### NATURE OF ACTION

1. This is an action for strict liability (failure to warn), strict liability (unreasonably dangerous), negligence, gross negligence, fraudulent misrepresentation, violation of the Idaho Consumer Protection Act, intentional infliction of emotional distress, negligent infliction of emotional distress and emotional distress from fear of developing a future disease.

## PARTIES

2.  Plaintiffs Linda Smiley and Mark Smiley are wife and husband, residing at all relevant times in Boise, Ada County, Idaho.  Plaintiff Linda Smiley suffered a sudden hemorrhagic stroke on January 3, 2001 as a result of ingesting Alka-Seltzer Plus, a cough and cold medication containing phenylpropanolamine ("PPA").  She was hospitalized for approximately three (3) weeks and suffers permanent neurological damage.  As a result of the medical problems that have afflicted his wife, Mark Smiley has suffered loss of consortium.

3.  Bayer Corporation, a subsidiary of Bayer, A.G., ("Bayer") is an Indiana corporation with its principal place of business is in Pittsburgh, Pennsylvania.  Bayer is one of the largest manufacturers of over-the-counter medications in the world.  Bayer is in the business of researching, developing, manufacturing, marketing, distributing and selling drugs, including Alka-Seltzer Plus.

4.  At all material times, Bayer manufactured, sold, distributed and marketed the drug Alka-Seltzer in several different formulas, including Alka-Seltzer Plus, which contained the active ingredient phenylpropanolamine ("PPA").  Bayer made and sold Alka-Seltzer Plus for use without prescription to consumers as an over-the-counter nasal decongestant and cough/cold remedy.

5.  Plaintiffs are currently unaware of the names and capacities of Defendants named as Does 1 through 10, inclusive, and therefore sue those parties as fictitious names.  Plaintiffs will seek leave to amend this Complaint and state the true names and capacities of the fictitiously named parties when their identities have been ascertained.

Plaintiffs are informed and believe, and on that ground, allege, that each of the Defendants designated as Doe is legally responsible for the events, happenings and actions alleged in this Complaint.

6. Upon information and belief, each and all of the Defendants have transacted business in Idaho during the relevant time period, including but not limited to, marketing, manufacturing, selling, distribution and/or delivery of Alka-Seltzer Plus.

## JURISDICTION

7. This Court has personal jurisdiction over each of the Defendants. Plaintiffs purchased Alka-Seltzer Plus in Ada County, Idaho. Bayer conducts business throughout Idaho, including in Ada County.

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs allege an amount in controversy in excess of $75,000.00, exclusive of interest and costs. There is complete diversity of citizenship between the Plaintiffs and Defendants.

9. Venue is proper in this action in the District of Idaho.

## FACTUAL BACKGROUND

10. Plaintiffs allege that Plaintiff Linda Smiley suffered personal injuries due to ingestion of Alka-Seltzer Plus manufactured and sold by Defendants.

11. Before her stroke, Plaintiff Linda Smiley was 43 years old and in good health. In or about September 2000, plaintiff bought a box of Alka-Seltzer Plus Night-Time Cold Medicine with phenylpropanalomine ("PPA")(hereinafter, "Alka-Seltzer Plus") to keep on hand. She bought the Alka-Seltzer Plus at a retail location in Boise, Idaho.

12. Plaintiff had never taken Alka-Seltzer Plus before purchasing the product as described above.

13. Plaintiff came down with a cold on or about December 31, 2000. She took two doses of Alka-Seltzer Plus, each at bedtime, one on January 1, 2001 and the other on January 2, 2001.

14. On the morning of January 3, 2001, Plaintiff arose in the morning and went to work. She drank coffee that morning before leaving for a work-related appointment. While she was driving back to work after her appointment, at approximately 10:30 o'clock, a.m., plaintiff developed a sudden, severe headache and a stiff neck.

15. Instead of continuing on her way to the office, she drove the remaining two blocks to her home and had her neighbor take her immediately to the emergency room at St. Alphonsus Regional Medical Center. Plaintiff's headache continued to worsen, and she lost consciousness upon arrival at the emergency room parking lot.

16. Thereafter, Plaintiff remained in a semi-catatonic or catatonic state for approximately four (4) days. Plaintiff was ultimately hospitalized for approximately three (3) weeks and continues to require medical care to monitor her condition.

17. As a result of her stroke, Plaintiff Linda Smiley has suffered permanent injury. Although Plaintiff returned to part-time work in March 2001, she may never again be capable of maintaining a full-time work schedule. She suffers from on-going symptoms including but not limited to, severe headaches, depression, difficulty sleeping, fatigue, confusion and memory loss.

## PHARMACOLOGY AND HISTORY OF PPA

18. PPA is a sympathomimetic amine similar in structure and function to amphetamine and ephedrine. Like other sympathomimetic drugs, PPA increases arterial blood pressure, produces pupil dilation, salivation and lacrimation, inhibits gut motility, inhibits the urinary bladder, and stimulates the release of norepinepherine.

19. In the United States, PPA was an ingredient in two main over-the-counter ("OTC") markets: as a decongestant in cough and cold products like Alka-Seltzer Plus, and as an appetite suppressant in diet pills. PPA was first used as a decongestant in 1936. PPA produces vasoconstriction of the mucosal blood vessels to alleviate contgestion. PPA was first used as an OTC appetite suppressant in 1972 for weight loss.

20. For decades, Defendants have known or should have known that human consumption of sympathomimetic drugs can cause serious, life threatening adverse health effects including damage to the cardiovascular and neurological systems. Known effects associated with the use of sympathomimetic drugs like PPA include hypertension, seizure, heart attack, headache, hypertensive encephalopathy, agitation, psychosis, hemorrhagic stroke, ischemic stroke, neurological problems and symptoms, cardiac problems, sudden cardiac and neurological changes, and death. Defendants as manufacturers and distributors of pharmaceutical products knew of the dangers associated with the consumption of sympathomemetic drug such as PPA and as such were fully aware of the dangers posed by the consumption of PPA. Despite this knowledge, for years, Defendants used PPA in many non-prescription, over-the-counter, medications such as cold remedies. Defendants marketed and advertised their products to

the general public and to the medical community as being safe and effective for their stated purposes.

21. Before November 2000, it is estimated that well over a billion doses of PPA were sold in diet, cold and decongestant products, including Bayer's drug Alka-Seltzer Plus. Over 80% of all OTC cold and decongestant products contained PPA. The decongestant market represented approximately 98% of PPA sales to consumers.

## THE FDA REGULATORY HISTORY OF PPA

22. PPA was first synthesized in 1910 and was used in the early 1930s as an alternative to ephedrine in maintaining blood pressure after surgery. The ability of PPA to raise arterial blood pressure is primarily due to the action of PPA on constricting blood vessels via direct and, possibly, indirect activation of alpha- I -adrenoceptors.

23. PPA in the United States has been used in two primary over-the-counter (OTC) markets: as a decongestant in cough and cold products and as an appetite suppressant in diet pills. PPA was first used as a decongestant in 1936 and produced vasoconstriction of the mucosal blood vessels to alleviate congestion. PPA was first used as an appetite suppressant in 1972.

24. In 1938, the Food and Drug Administration ("FDA") was created. Under the original Act (Federal Food, Drug and Cosmetic Act of 1938, now codified at 21 U.S.C. §§ 301 et seq.), new drugs required the approval of the FDA. Existing drugs were 11 grandfathered" under the Act and thus exempted from the testing requirements of new drugs. No proof of safety was required for grandfathered drugs. Having been on the market as a decongestant since 1936, PPA was exempt from the new drug approval process.

25. In 1962, the Drug Amendments to the Act, Pub. L. No. 87-781, 76 Stat. 780, required proof of effectiveness for all new drugs, including those approved between 1938 and 1962. The pre-1938 drugs previously "grandfathered" under the Act, such as PPA, continued their exempt status.

26. The FDA regulates all OTC drugs, which are classified by the FDA as Category I (safe and effective); Category II (not safe and effective); or Category III (insufficient data to assess safety).

27. In 1972, the FDA began to review OTC drugs for classification. As an OTC product marketed before 1972, PPA was allowed to continue on the market until a "final monograph" relating to the drug's category became effective. The FDA never finalized a monograph for PPA because of concerns about reports of hemorrhagic stroke associated with using this drug. PPA was never classified by the FDA as a Category I (safe and effective) OTC drug.

## PPA'S ASSOCIATION WITH RISK OF HEMORRHAGIC AND ISCHEMIC EVENTS

28. For more than twenty years, the OTC pharmaceutical industry, including the Defendant, has been aware of reports of hemorrhagic stroke, ruptured aneurysms, heart arrhythmia, cerebral vascular accidents, infarctions and heart attacks, associated with the use of PPA. Furthermore, published reports of PPA use associated with hypertension date back over thirty years.

29. Since 1979, there have been over thirty published case reports in the respected medical literature of stroke and PPA ingestion, often after the first use of the product. A number of these authors, medical authorities and medical "Watch-Dog" agencies such as

Public Citizen called for the removal of PPA from the OTC market. Case reports and medical literature reviews of hemorrhagic stroke and cerebral vascular accidents after PPA exposure appearing in the scientific and medical literature include but are not limited to:

King (1979)

Elliot and White (1981)

Bernstein and Diskant (1982)

Johnson, Etter, and Reeves (1983)

Mueller (1983)

Pentel (1984)

Fallis and Fisher (1985)

Kikta (1985)

McDowell, LeBlanc (1985)

Stoessl, Young and Feasby (1985)

Edwards, Russo, Harwood-Nuss (1987)

Glick, et at (1987)

Kase, et at (1987)

Forman, et at (1989)

Montalban, et at (1989)

Chung(1998)

Hamilton, et at (2000)

Lake, Gallant, Masson, Miller (2000)

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO Fed. R. Civ. P. 38(b), P. 8**

30. Since at least 1980, it has been recognized by the medical and scientific community that PPA can cause severe hypertension, and that at the same time, it has a direct effect on vasoconstriction of small blood vessels.

31. In 1981, an editorial in the American Journal of Medicine and the consumer group publication, Public Citizen, expressly recommended against PPA use in the OTC market because of safety risks, especially those related to hemorrhagic stroke.

32. In 1983, the FDA determined that PPA raises blood pressure and later met with industry officials to discuss the need for more data to evaluate the safety concerns surrounding PPA and life threatening adverse reactions including hypertension and stroke.

33. In 1984, the FDA banned the sale of products containing a combination of PPA and caffeine due to safety and health concerns.

34. In 1985, the FDA issued a tentative final monograph for classifying OTC nasal decongestants. PPA, however, was omitted from the monograph due to safety concerns.

35. In 1990, a review article of 142 PPA case reports concluded that the most serious adverse reactions (stroke and seizure) were caused by PPA products.

36. Also, in 1990, a subcommittee of the U.S. House of Representatives Small Business Committee held hearings on diet drugs containing PPA. At the hearings, several scientific witnesses and one national society of physicians called for the removal of PPA from the OTC market because of safety and health concerns. After the hearings, the subcommittee's chairman, U.S. Representative Ron Wyden, wrote to the FDA expressing his concern about PPA and noting that an epidemiological study had demonstrated that

PPA preparations lead all other OTC products in the number of serious and fatal adverse effects in people under 29 years of age, as well as the number of contacts with Poison Control Centers each year.

37. Between 1969 and 1991, 29 cases of cerebral vascular incidents associated with PPA use were reported to the FDA through its spontaneous adverse event reporting system. Of these 29 reports, 22 were hemorrhagic strokes associated with PPA use. Of these strokes, 55% occurred after just one dose of the PPA product.

38. In 1991, H. M. Jolson produced an internal report for the FDA that examined the reports of cerebral vascular stroke in the FDA spontaneous reporting system for PPA versus all other drugs for women for the period of 1969-1991. Her analysis indicated that cerebral vascular stroke was the most common event for PPA-containing products; that such events were also evident in cough-cold preparations; and that such events were often associated with first use of PPA products. Despite this information, consumers were not being timely or adequately warned by the pharmaceutical industry about the then-known association between PPA and stroke.

39. In 1991, the FDA held a public meeting to address the issues regarding safety and effectiveness of PPA before publishing a final monograph for the drug. Reports of hemorrhagic strokes associated with PPA use were discussed at the meeting.

40. Between 1991 and 2000, the FDA received an additional 22 reports of hemorrhagic strokes associated with PPA use. Four of these consumers died of their stroke injuries.

41. Although most of the attention has been directed to the association between PPA and hemorrhagic stroke, there have been numerous case reports of heart attacks,

lacunar infarcts, infarcts of cerebral arteries, and ischemic events associated with the use of PPA. The same mechanism, PPA causing severe hypertension and direct vasoconstriction of the blood vessels, which causes hemorrhagic strokes and ruptured aneurysms, causes these ischemic events and heart attacks.

42. Thus, by the time Plaintiff Linda Smiley ingested Alka-Selzer Plus, numerous reports of PPA-related serious health problems including hemorrhagic stroke, ischemic stroke, hypertension and neurological and cardiac symptoms and problems, had been made to the FDA and knowledge of that information and the reasons why PPA should be removed from the marketplace were well known, or should have been, to the Defendants. These numerous adverse reports and the ongoing Yale Study, jqfta, were known, or should have been known, to the Defendants, however, said Defendants persisted in the distribution, marketing and sale of Alka-Seltzer Plus and other PPA products.

## THE YALE HEMORRHAGIC STROKE STUDY

43. In March of 1993, the FDA issued a letter to the Nonprescription Drug Manufacturers Association outlining its concerns regarding the safety of PPA and informed the industry that it intended to classify PPA as a Category III drug (insufficient data to assess safety). To avoid this classification, manufacturers of PPA proposed a study, which later became known as the Yale Hemorrhagic Stroke Study, to investigate the link between PPA and strokes. While the study was ongoing, the manufacturers were able to continue selling PPA products.

44. Subsequently, the FDA began working with PPA manufacturers and investigators at Yale University School of Medicine to design the protocol for the study,

a case controlled epidemiological study to examine and quantify the risk of hemorrhagic stroke and PPA use.

45. On December 13, 2000, in a New York Times article the FDA director of OTC drugs stated that if the Yale study had not been undertaken, "The agency probably would have decided to take PPA off the market [in 1992]."

46. In September 1994, the Yale Study, which was funded by the phan-naceutical industry, began. The study was completed in June 1999.

47. The Yale Study confirmed by epidemiological methodologies that the use of PPA substantially increases the risk of hemorrhagic stroke. Use of PPA in an appetite suppressant was significantly associated with the risk of hemorrhagic stroke. The "first use" of any PPA product involving "cough/cold" remedies was also associated with the risk of hemorrhagic stroke.

48. Defendants were provided with the final results of the Yale Study, at the latest, during the May 2000 meetings with the FDA, but were also aware of the existence of the study for years prior to that date and the concerns that existed in the medical/scientific community that PPA was associated with causing hemorrhagic strokes.

49. On November 6, 2000, the summary results of the Yale Study appeared in the popular press, including the front page of the New York Times newspaper. On December 21, 2000, the study and its results were officially published as an original, lead article in the peer-reviewed New England Journal of Medicine. Its authors concluded that the Yale Study, "provides strong epidemiological evidence of the association between the use of phenylpropanolamine and the risk of hemorrhagic stroke." Walter N. Kernan et al.,

<u>Phenylpropanolamine and the Risk of Hemorrhagic Stroke,</u> 343 New Eng. J. Med. 1826,1831 (2000).

50. Read in conjunction with the large body of prior published medical case reports, FDA adverse event reports and related clinical observations, the Yale Study establishes by every conventional legal criteria and standard the "general causation" principle: PPA causes hemorrhagic strokes in human beings.

## THE FDA RECOMMENDS PPA BE WITHDRAWN

## FROM THE MARKET

51. On October 19, 2000, members of the Non-Prescription Drugs Advisory Committee for the FDA's Center for Drug Evaluation and Research met to vote on the safety of PPA in light of the Yale Study findings. The 15-member panel voted overwhelmingly that PPA was unsafe, and recommended to the FDA that PPA be removed from the marketplace.

52. On November 6, 2000, the FDA, in reliance upon its advisory committee and the findings of the Yale Study, officially recommended that all pharmaceutical companies voluntarily remove PPA from their products. By correspondence of the same date, the FDA urged all manufacturers and sellers of OTC products containing PPA to cease immediately the distribution and sale of said products.

53. On the same day, the FDA's Nonprescription Drugs Advisory Committee issued the following advisory:

Food and Drug Administration

Public Health Advisory

Subject: Safety of Phenylpropanolamine

November 6, 2000

*The Food and Drug Administration (FDA) is issuing a public health advisory concerning phenylpropanolamine hydrochloride. This drug is widely used as a nasal decongestant (in over-the-counter and prescription drug products) and for weight control (in over- the-counter drug products). FDA is taking steps to remove phenylpropanolamine from all drug products and has requested that all drug companies discontinue marketing products containing phenylpropanolamine.*

*Phenylpropanolamine has been marketed for many years. A recent study reported that taking phenylpropanolamine increases the risk of hemorrhagic stroke (bleeding into the brain or into tissue surrounding the brain) in women. Men may also be at risk. Although the risk of hemorrhagic stroke is very low, FDA recommends that consumers not use any products that contain phenylpropanolamine.*

*FDA's Nonprescription Drugs Advisory Committee (NDAQ recently discussed this study and other information on phenylpropanolamine. NDAC determined that there is an association between phenylpropanolamine and hemorrhagic stroke and recommended that phenylpropanolamine not be considered safe for over-the-counter use.*

*Although this risk of hemorrhagic stroke is very low, FDA has significant concerns because of the seriousness of a stroke and the inability to predict who is at risk. FDA does not consider the conditions for which phenylpropanolamine is used (over-the--*

*counter or by prescription) as justifying the risk of this serious event. Other products are available for use.*

*In the meantime, consumers can identify over-the-counter cough/cold, nasal decongestant, and weight control products containing this ingredient by looking for "phenylpropanolamine" in the list of active ingredients on the label. Consumers can check with their health care provider or pharmacist to see whether their prescription cough-cold or nasal decongestant product contains phenylpropanolamine. We advise consumers to discuss alternative over-the-counter and prescription products with their health care providers or pharmacists.*

54.   FDA analysts, relying upon the Yale Study, estimate that 200-500 strokes occur per year in United States women age 18-49 resulting from ingestion of PPA products.

55.   The FDA has concluded after internal and independent analysis that the Yale Study was "carefully designed," "conducted with great attention to detail," and constitutes a "careful analysis." Moreover, the FDA has confirmed the major findings of the Yale Study by conducting its own analysis of the epidemiological data. The FDA has concluded that the Yale Study "strongly supports" their working hypothesis: PPA use increases the risk of hemorrhagic stroke. Indeed, the FDA has concluded that the Yale Study results largely fulfill the criteria needed to establish "causality."

## DEFENDANTS' KNOWLEDGE ABOUT PPA AND THE RISK OF

## HEMORRHAGIC STROKE

56.     Defendants knew or should have known, about the decades-long history of case reports in the published medical literature establishing a meaningful clinical/medical association between PPA and risk of stroke, as well as from the fifty-plus adverse event reports filed with the FDA, as well as numerous adverse reports from the Company's own internal safety surveillance database, all of which related to strokes arising from PPA exposure.

57.     Defendants also were and are fully aware of the significant underreporting of adverse events associated with OTC drugs in spontaneous safety surveillance systems, such as that at the FDA regarding PPA and strokes. The FDA has estimated that as few as 1% of all PPA-associated adverse events have been reported. Utilizing that learned estimate, the 44 FDA adverse reports between 1969 and 2000 which arose from cases of hemorrhagic stroke associated with PPA use, would translate into 4400 such cases over the years in question.

58.     Defendants used PPA in their products due to its efficacy as an appetite suppressant. However at the same time, PPA also works to constrict blood vessels in the brain and heart. The process of constricting blood vessels raises blood pressure and causes severe hypertension. When blood pressure is raised to a critical level it increases the likelihood of severe life threatening and often fatal effects including but not limited to heart attack and stroke.

59.     Defendants were aware or should have been aware of the evidence relating PPA to potentially life threatening and fatal reactions.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO**
**Fed. R. Civ. P. 38(b), P. 16**
#17055.001  LDM:bdp  H:\S\Smiley, Linda\Misc\Model Pleadings\Smiley Complaint - Filed.doc  1/2/03

60. In addition to studies conducted by the FDA and the scientific community, Defendants separately and through trade organizations have engaged in collecting data and information tending to demonstrate the connection between PPA and serious adverse health affects.

61. At all times material, manufacturing Defendants were members of the Consumer Healthcare Products Association ("CHPA") (f/k/a Non-Prescription Drug Manufacturers Association ("NDMA")). A function of the CHPA is to provide information to its members concerning issues of importance to the industry. As a member of the CHPA, Defendants participated in numerous communications and discussions directly related to the safety and known adverse health effects of products containing PPA.

62. CHPA set up a PPA Task Force whose objective was, among other things, to study the adverse effects of PPA and to address concerns of the scientific and medical communities with respect to PPA. In working to fulfill its mission, CHPA's Task Force collected information from the medical and scientific communities. Defendants, by and through CHPA and the PPA Task Force, reviewed the collected medical and scientific literature regarding products containing PPA. As such, Defendants were fully aware of the numerous articles, treatises, reports and other evidence relating to the association between PPA and adverse health effects including stroke, heart attack, arrhythmias and death.

63. Despite Defendants' knowledge concerning the adverse affects of PPA, Defendants continued to manufacture, market, advertise, distribute, and sell products containing PPA. Defendants promoted PPA products as safe and effective with little or

no side effects. In addition, Defendants made no efforts to warn the general public of the dangers associated with PPA nor did Defendants take any steps to alert the medical community and inform them of the significant risks associated with PPA.

64.     To the contrary, Defendants actively engaged in downplaying and minimizing any potential adverse side effects associated with the consumption of PPA. Defendants represented to the general public and to the medical community that PPA products were safe for human consumption. Defendants concealed from the general public that PPA in OTC products could cause stroke, heart attack, heart arrhythmias and death.

65.     Defendants knew or should have known that the general public considered over-the-counter medications, like the Alka-Seltzer Plus products to be innocuous because of their ready availability without a prescription. The perception of the public relating to the safety of such over-the-counter drugs only increased the likelihood of serious adverse health consequences associated with the consumption of PPA.

66.     Defendants failed to sufficiently test PPA products prior to marketing and selling them to the general public. The tests and studies performed by Defendants on PPA products lacked validity in that Defendants failed to test PPA products and their effects on the cardiovascular and central nervous systems over a reasonable period of time before and during the distribution and sale of the PPA products to the public. Nevertheless, Defendants represented PPA products as pharmaceutically tested and safe for consumption, placing the general population at risk of severe adverse health effects including stroke, heart attack, heart arrhythmas and death.

67. Based upon Defendants' marketing, advertising, promotion and representation of products containing PPA as being safe and effective, Plaintiffs purchased and ingested Defendants' products containing PPA. However, Defendants' products were not safe as marketed, advertised, promoted and represented by Defendants in that Defendants knew or should have known that PPA products could cause stroke, heart attack, heart arrhythmas and death. Defendants failed to warn Plaintiffs that ingesting medicines that contain PPA may result in a stroke.

68. Throughout the time period that Defendants manufactured, offered, distributed, marketed and sold products containing PPA, they have been aware of the health risk and adverse effects of PPA. Defendants have concealed this information from Plaintiffs and from the general public. Plaintiffs did not discover and could not have discovered this information absent Defendants' disclosure. Because of the intentional conduct of the Defendants and the pharmaceutical industry to conceal important information about the dangerous risks of PPA medications, the information was not known to Plaintiffs. Plaintiffs have just now learned of some of these risks.

69. Plaintiffs first learned of the dangers of ingesting medications containing PPA, when they saw it in the general media, after November 6, 2000. It was only after seeing numerous press releases about the medications which contain PPA and listings of the medicines containing PPA, and information that it was associated with strokes, that Plaintiffs knew of the dangers of the drug and what caused the injuries. But for the news media publishing the dangers of PPA, they would not have known of these facts, and could not and would not have known that the ingestion of PPA caused their injuries.

## PLAINTIFFS' DAMAGES

70.     As a direct producing and proximate result of the actions and conduct of these Defendants as set forth above, Plaintiffs, each of them individually, have sustained injuries and are entitled to a judgment for at least the following damages:

> a)     Reasonable and necessary health care expenses incurred in the past;
>
> b)     Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;
>
> c)     Physical pain and suffering in the past;
>
> d)     Physical pain and suffering which, in all reasonable probability, will be endured in the future;
>
> e)     Mental anguish suffered in the past;
>
> f)     Mental anguish which, in all reasonable probability, will be suffered in the future;
>
> g)     Physical disability/impairment, past and future;
>
> h)     Lost wages in the past and future loss of wage earning capacity; and
>
> i)     All other incidental and consequential damages, fees and expenses.

### FIRST CLAIM FOR RELIEF

### STRICT LIABILITY (FAILURE TO WARN)

71.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

72.     As defined in I.C. § 6-1401 *et seq.*, each Defendant is a manufacturer and/or seller of Alka-Seltzer Plus.

73.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants were unaccompanied by proper warnings regarding possible injuries associated with the use of the Alka-Seltzer Plus and the comparative severity and duration of such injuries; the warnings given did not accurately reflect the symptoms, scope or severity of such injuries.

74.     Each Defendant failed to perform adequate testing in that adequate testing would have shown that Alka-Seltzer Plus presented serious risk of injuries with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made, both with respect to the use of this drug individually or in combination with caffeine or other drugs or substances.

75.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective due to inadequate pre-marketing and post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury from PPA, they failed to provide adequate warnings to users or consumers of Alka-Seltzer Plus and continued to aggressively promote Alka-Seltzer Plus and other PPA-containing over-the-counter drugs.

76.     As the producing cause and legal result of the defective condition of the Alka-Seltzer Plus as manufactured and/or supplied by Defendants, and as a direct and legal result of the action(s) of Defendants described herein, Plaintiffs have been injured as described herein.

## SECOND CLAIM FOR RELIEF

## STRICT LIABILITY (UNREASONABLY DANGEROUS)

77.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

78.     As defined in I.C. § 6-1401 *et seq.*, each Defendant is a manufacturer and/or seller of Alka-Seltzer Plus.

79.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or supplier, the foreseeable risks exceeded the benefits associated with the design or formulation of that drug.

80.     Alternatively, the Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective in design or formulation, in that, when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous, and was more dangerous than an ordinary consumer would expect.

81.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective due to inadequate warning or instruction because the manufacturers and/or suppliers knew or should have known that Alka-Seltzer Plus created an unreasonable risk of harm to consumers and the Defendants failed to adequately warn of said risks.

82.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective due to inadequate warning and/or inadequate testing.

83.     The Alka-Seltzer Plus manufactured and/or supplied by Defendants was defective due to inadequate pre-marketing and post-marketing warning or instruction because, after the manufacturers and/or suppliers knew or should have known of the risk

of injury from PPA, used either individually or in combination with other substances, they failed to provide adequate warnings to users or consumers of the known dangers associated with Alka-Seltzer Plus and continued to promote that and other PPA-containing drugs.

84.     As the producing cause and legal result of the defective condition of Alka-Seltzer Plus as manufactured and/or supplied by Defendants, and as a direct and legal result of the action(s) of Defendants described herein, Plaintiffs have been injured as described herein.

<div align="center">

**THIRD CLAIM FOR RELIEF**

**NEGLIGENCE AND GROSS NEGLIGENCE**

**(DUTY TO PREVENT RISK OF UNREASONABLE SIDE EFFECTS)**

</div>

85.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

86.     Defendants had a duty to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, packaging, promotion sale and/or distribution of their products containing PPA, including but not limited to Alka-Seltzer Plus, into the stream of commerce, including a duty to assure that the Alka-Seltzer Plus did not cause users to suffer from unreasonable, dangerous side effects.

87.     Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of the Alka-Seltzer Plus into interstate commerce in that Defendants knew or should have known that the Alka-Seltzer Plus created a high risk of unreasonable, dangerous side effects, including, without limitation, brain hemorrhage and hemorrhagic stroke.

g) Failed to warn that blood pressure and norepinepherine levels are affected by use of Alka-Seltzer Plus, which effect can cause other serious health risks;

h) Failed to warn that the risks associated with the Alka-Seltzer Plus would exceed the risks of other comparable forms of cold remedies;

i) Failed to effectively warn about the increased danger and unapproved status of combined use of Alka-Seltzer Plus with caffeine and/or other substances;

j) Failed to adequately warn Plaintiffs that use of the PPA products was more dangerous than they believed, and that the products carried a risk of death due to stroke; and

k) Were otherwise careless, negligent or grossly negligent.

89.     Despite the fact that Defendants knew or should have known that Alka-Seltzer Plus may cause unreasonable, dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market Alka-Seltzer Plus to consumers, including Plaintiff Linda Smiley, when there were safer alternative methods of treating cold symptoms.

90.     Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

91.     Defendants' willful, reckless, grossly negligent and negligent behavior was a proximate cause of Plaintiff Linda Smiley's increased risk of harm as previously set forth herein.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE AND GROSS NEGLIGENCE

## (DUTY TO DISCLOSE)

92.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth here and further allege as follows:

93.     Defendants had a duty to timely disclose to the United States Food and Drug Administration ("FDA"), to health care providers and to the public, relevant information which was known or which should have been known to Defendants, concerning the incidence of dangerous side effects associated with Alka-Seltzer Plus.

94.     Defendants failed to timely disclose to the FDA, to health care providers and to the public, relevant information concerning the incidence of brain hemorrhage, hemorrhagic stroke and other dangerous side effects associated with Alka-Seltzer Plus, which was known, or should have been known, to Defendants.

95.     Defendants were negligent and grossly negligent by failing to timely disclose to the FDA, to health care providers and to the public, relevant information concerning the incidence of brain hemorrhage and hemorrhagic stroke, which was known to Defendants, but which Defendants omitted to timely disclose, in that they:

        a)     Knowingly and recklessly omitted adequate warnings with the product that would alert Plaintiffs and other consumers to the potential risks and serious side effects of the products;

        b)     Knowingly and recklessly omitted adequate and proper tests for the products before placing them on the market;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO**
**Fed. R. Civ. P. 38(b), P. 26**
#17055.001  LDM:bdp  H:\S\Smiley, Linda\Misc\Model Pleadings\Smiley Complaint - Filed.doc  1/2/03

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT

99.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

100.    Defendants knew, or in the exercise of due care, should have known, that the representations they made to the Plaintiffs regarding the use, quality and benefit of Alka-Seltzer Plus were false.  Defendants knew, or in the exercise of due care, should have known, that the representations they made to the Plaintiffs regarding Alka-Seltzer Plus' particular standard quality were false.

101.    Defendants acted in a misleading, false or deceptive manner in labeling, packaging, supplying, marketing, selling, advertising, warning or otherwise distributing Alka-Seltzer Plus, when the Defendants knew or should have known that Alka-Seltzer Plus was fatally defective.

102.    Defendants' conduct or pattern of conduct is outrageous or offensive to the public conscience.  By all these actions, Defendants violated the Idaho Consumer Protection Act, damaging Plaintiffs.

103.    As a result of the Defendants' acts or omissions, Plaintiffs are entitled to all the remedies afforded under that Act.

## SIXTH CLAIM FOR RELIEF

## BREACH OF EXPRESS WARRANTY

104.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO Fed. R. Civ. P. 38(b), P. 28**

#17055.001  LDM:bdp  H:\S\Smiley, Linda\Misc\Model Pleadings\Smiley Complaint - Filed.doc  1/2/03

105.    Defendants made certain affirmations of fact or promises regarding the Alka-Seltzer Plus they sold to Plaintiff Linda Smiley which became a basis for the bargain between the parties and were express warranties.

106.    The Alka-Seltzer Plus ingested by Plaintiff Linda Smiley does not conform to the affirmations of fact or promises the Defendants made regarding Alka-Seltzer Plus. Defendants breached these express warranties by selling to Plaintiff Linda Smiley Alka-Seltzer Plus which is defective, non-conforming and not safe to use due to those defects and non-conformities.

107.    As a result of the Defendants' acts or omissions, Plaintiff Linda Smiley Thompson suffered an increased risk of harm previously described herein.

## SEVENTH CLAIM FOR RELIEF

## BREACH OF IMPLIED WARRANTIES

108.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

109.    At the time Defendants marketed, sold and distributed Alka-Seltzer Plus for use by Plaintiff Linda Smiley, Defendants knew of the use for which Alka-Seltzer Plus was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

110.    Plaintiff Linda Smiley reasonably relied upon the skill and judgment of Defendants in determining whether Alka-Seltzer Plus and/or its use in combination with caffeine or other substances, was of merchantable quality and safe and fit for Plaintiff's intended use.

direct aid and advice of a physician, and that Plaintiffs would be relying on information, advertisements and statements made by Defendants about the use, safety and efficacy of these PPA products.

117.   At the time of Defendants' fraudulent misrepresentations and concealments, Plaintiffs were unaware of the falsity of the statements being made and believed them to be full, complete and true representations. Plaintiffs further had no knowledge of the information concealed and/or suppressed by Defendants.  Plaintiffs justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information which the Defendants did suppress, conceal or fail to disclose to Plaintiffs' detriment.

118.   Defendants had a post-sale duty to warn Plaintiffs and the public about the potential risks and complications associated with products containing PPA in a timely manner.  The misrepresentations and active fraudulent concealment by the Defendants constitutes a continuing tort against Plaintiffs and other persons who ingested these PPA products.

119.   Defendants made the misrepresentations and actively concealed information about the defects and dangers of the products with the intention and specific desire that the Plaintiffs and the consuming public would rely on such or the absence of information in selecting the drug as an appetite suppressant.

120.   As a direct and proximate result of Defendants' fraudulent acts and omissions, Plaintiffs have suffered, and will continue to suffer, harm, personal injury, damages and loss as previously described.

121.    Defendants' willful and reckless actions and omissions demonstrate an extreme deviation from reasonable standards of conduct and a flagrant disregard for human life, rendering Defendants liable to Plaintiffs.

## NINTH CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

122.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

123.    At all times mentioned, Defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of the Alka-Seltzer Plus into the stream of commerce, including a duty to assure that Alka-Seltzer Plus did not cause users to suffer from unreasonable and dangerous side effects.

124.    Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control and/or distribution of Alka-Seltzer Plus into interstate commerce in that Defendants knew, or should have known, that Alka-Seltzer Plus with PPA created a high risk of unreasonable and dangerous side effects.

125.    Defendants were negligent and grossly negligent in the design, manufacture, testing, advertising, warning, marketing and sale of Alka-Seltzer Plus with PPA as stated herein.

126.    Defendants' conduct constitutes reckless disregard of the probability of such conduct causing Plaintiffs severe emotional distress.

127.    As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff Linda Smiley has suffered severe emotional distress, including physical

manifestations of distress, sleep disorders, reduced libido, mood swings, anxiety and depression.

128.    As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff Mark Smiley has suffered severe emotional distress, including physical manifestations of distress, the precise nature of which shall be proven at trial.

129.    As a direct, proximate and foreseeable result of Defendants' willful and reckless conduct, Plaintiffs have been damaged in an amount to be proven at trial.

### TENTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

130.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

131.    Defendants possessed knowledge of the dangerous consequences of Alka-Seltzer Plus, but nevertheless intentionally failed to disclose such consequences to the Plaintiffs, the public and the FDA.

132.    As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff Linda Smiley has suffered severe emotional distress, including physical manifestations of distress, sleep disorders, reduced libido, mood swings, anxiety and depression.

133.    As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff Mark Smiley has suffered severe emotional distress, including physical manifestations of distress, the precise nature of which shall be proven at trial.

134.    As a result of the Defendants' intentional actions and omissions, Plaintiffs have been damaged in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF

### LOSS OF CONSORTIUM

135.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege as follows:

136.   At all relevant times, Plaintiffs have been married and residing together as man and wife.

137.   As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff Mark Smiley has suffered loss of love and attention, support, guidance, companionship, services, society and consortium, and will continue to suffer such loss in the future.

138.   As a direct, proximate and foreseeable result of the Defendants' willful and reckless conduct, Plaintiffs have been damaged in an amount to be proven at trial.

### WILLFUL AND RECKLESS CONDUCT

2.   Plaintiffs further generally allege that Defendants' conduct herein was reckless or willful, and, therefore, the limitation on non-economic damages set forth in I.C. § 6-1603 does not apply to Plaintiffs' claims.

### INTEREST

3.   Plaintiffs request pre-judgment interest pursuant to Idaho Code § 28-22-104 on their damages and post-judgment interest as allowed by law.

### ATTORNEY FEES

4.   By reason of the Defendants' wrongful conduct as alleged herein, Plaintiffs have been required to engage the services of the undersigned law firm and have and will incur costs, expenses and fees related thereto, in all phases of representation, and by

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO Fed. R. Civ. P. 38(b), P. 35**
#17055.001  LDM:bdp  H:\S\Smiley, Linda\Misc\Model Pleadings\Smiley Complaint - Filed.doc  1/2/03

virtue of which are entitled to reasonable reimbursement of such costs and expenses, and an award of attorney fees as the law and the circumstances of this case allow, in such sums as will be proven and shown following trial. Plaintiffs are entitled to attorney fees pursuant to Idaho Code §§ 12-120, 12-121, 12-123 and Idaho Code § 48-608, or other applicable law.

**WHEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:**

1.      For judgment against the Defendants for actual, incidental, and consequential damages in amounts to be proven at trial.

2.      For a determination by this Court that I.C. § 6-1603 shall not apply to these proceedings.

3.      For pre-judgment and post-judgment interest as allowed by law.

4.      For attorney fees, expenses, and costs of this action.

5.      For such other and further relief as the Court deems necessary, just and reasonable in the premises.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial in this action pursuant to Fed. R. Civ. P. 38(b).

Dated: January 2, 2003

Richard H. Greener
LaDawn Marsters

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL PURSUANT TO Fed. R. Civ. P. 38(b), P. 36**
#17055.001  LDM:bdp  H:\S\Smiley, Linda\Misc\Model Pleadings\Smiley Complaint - Filed.doc  1/2/03